### Johnson, Jr., Trustee v. Bowling, et al.

(Decided October 25, 1918.)

## Appeal from Pike Circuit Court.

1. Judges—Vacation of Bench—Application.—In order to require the trial judge to vacate the bench, as may be done under section 968 of the Kentucky Statutes, the application must be made before the appearance to the merits of the action, or the submis-

sion of preliminary motions preparatory to a trial, unless the affidavit is based upon facts discovered after the issue was made.

2.  Trusts—Discharge by Payment of Debt.—Where a debtor caused his lands to be conveyed to trustees for the payment of his debts, and the debtor subsequently paid his debts in full, he may maintain an action in equity to require the trustees to re-convey the land to the debtor, or to his vendee.

3.  Frauds, Statute of—Application of.—Where a debtor caused his lands to be conveyed to trustees for the payment of his debts and he subsequently paid his debts and instituted an action in equity to require the trustees to convey the lands to the vendee of the debtor, the statute of frauds has no application. since the action was not based upon any contract between the trustees and the vendee of the debtor, but upon the trust relation that existed between the trustees and the debtor.

CLINE & STEELE for appellant.

J. J. MOORE for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

Prior to 1911 J. M. Bowling, of Pikeville, the plaintiff in this action, had obtained certain contracts giving him the option to buy the mineral rights in two tracts of land in Pike county, belonging to James Bowling and Newsom, and aggregating 430 acres, at $20.00 per acre. J. M. Bowling became financially embarrassed; and, in about 1911 he filed a voluntary petition in bankruptcy in the United States District Court for the Eastern District of Kentucky. He also became involved in litigation with reference to the contracts which he held for the purchase of the lands above referred to. His vendors refused to carry out their contracts, and Bowling instituted an action in the Pike circuit court for a specific performance of his contracts, and obtained a judgment in the circuit court granting him the relief he asked. That judgment was affirmed by this court on November 2nd, 1916. See Bowling v. Bowling, 172 Ky. 32. The bankruptcy proceedings had been held in abeyance pending the final decision of the litgation in the state courts, as the creditors of Bowling realized that their prospect of obtaining any substantial payment upon their debts against him depended largely upon a favorable ending of the suit in the state courts.

Immediately after the affirmance of his case by the Court of Appeals, Bowling took active steps to secure the money with which to discharge his indebtedness, includ-

ing the purchase price for the property involved in the state court litigation. With this view he called a meeting of his creditors at Ashland, Ky., which resulted in a written agreement dated December 23rd, 1916, and signed by Bowling and his creditors, appointing W. B. Taylor, J. E. Ratliff and J. W. Ford, all of Pike county, to act as Bowling's trustees for the purpose of taking over the mineral property and disposing of it to the best interests of all concerned.

This agreement placed upon the trustees the duty of raising the funds necessary to pay Bowling's purchase money, amounting to about $10,000.00; and it further authorized and directed that Taylor, Ratliff and Ford take the title to the lands in their names as trustees, and hold the same in trust for Bowling and his creditors upon the following terms:

"First. To secure the payment of such funds as may be obtained or provided for the payment of the purchase money for said land above referred to, together with all interest thereon.

"Second. To pay the undersigned creditors of said J. M. Bowling the amount due them, or their *pro rata* portions thereof.

"Third. That said lands shall be held by said trustees and sold by them at the most advantageous price to be obtained therefor within one year from this date and the proceeds thereof applied as hereinbefore set out.

"Fourth. We further agree that this proceeding in bankruptcy shall be dismissed and we and each of us do hereby waive, so far as we legally can, any and all notice of the motion for application of a dismissal of said proceedings, or a hearing thereof; all of the costs of said proceedings to be paid by J. M. Bowling."

This paper was put in the shape of a petition by Bowling and all of his creditors, including the trustees, who were his largest creditors, to the judge of the bankruptcy court. Accordingly, on January 3rd, 1917, an order of dismissal was entered in the bankruptcy court, which contained, among other things, the following paragraph:

"It is ordered that the petition of the bankrupt for adjudication as a bankrupt and all proceedings had thereunder be, and the same are now dismissed, and pursuant to agreement of said bankrupt and his creditors any and

all funds or property of every kind or nature whatsoever which would or have been vested in the trustee (meaning in bankruptcy) are now ordered to be turned over to J. W. Ford, J. E. Ratliff and W. B. Taylor, trustees.''

In due course of time, by a deed dated January 9th, 1917, James Bowling and wife conveyed to Taylor, Ratliff and Ford, as trustees, 314 acres of the land in controversy. That deed recited that, .

''The said parties of the second part herein have been agreed upon and named as trustees to take and hold title to all of the estate of the said J. M. Bowling, including property of any kind or nature for the benefit of the said J. M. Bowling and all of his creditors who have legal or lawful claims against the said J. M. Bowling, and to make sale of the said property within a period of twelve months from the date of said written agreement.''

On February 13th, 1917, Taylor, Ratliff and Ford, as trustees for J. M. Bowling, received a similar deed from Newsom and wife for the remaining tract of 115 acres covered by Bowling's contract.

To raise the money to pay for the mineral property the trustees executed a note to the First National Bank of Pikeville for $10,000.00, which according to the proof, was amply secured by the mineral lands to which the trustees held title.

In the meantime, by a contract dated January 5th, 1917, but signed later, Bowling agreed to pay to Taylor and Ratliff commissions as follows: That in the event Taylor and Ratliff were able to sell the property for $45.00 per acre and no more, Bowling should pay them $250.00 each; and, in the event they made a sale for more than $45.00 Bowling would pay them an amount equal to one-half of any amount received in excess of $40.00 per acre.

On January 11th, 1917, the trustees entered into a contract with J. L. Morgan by which they gave Morgan an option to buy the Bowling property at $60.00 per acre, within forty days from that date. This option extended to February 20th; but before it expired the trustees became dissatisfied, and Ford offered Morgan $100.00 to release them from the contract; and, a controversy having arisen between Morgan and the trustees over the terms of the option, and in order to avoid any litigation with them, Morgan cancelled the contract.

In the meantime, Bowling's creditors had become persistent; and feeling the nervous strain under which he was laboring, Bowling determined to make an effort to sell the land himself, without waiting longer for the trustees to act. Consequently, on March 17th, 1917, by a written contract acknowledged and recorded that day, Bowling sold the land to Rogers and Day for $55.00 per acre.

The next day—March 18th, 1917—or not later than March 19th, 1917, Taylor and Ratliff having learned of the sale to Rogers and Day, upbraided Bowling severely for having attempted to act independently of the trustees, and on March 19th, 1917, the trustees executed a contract by which they attempted to sell the land to the appellant, J. R. Johnson, Jr., trustee, for $55.00 per acre. This contract of sale to Johnson was ante-dated to February 24th, 1917, and purported to have been acknowledged on that day by Taylor and Ford, and by Ratliff on March 19th. It is freely admitted, however, of record, that the paper was executed on March 19th, and that the notary certified it had been acknowledged on February 24th, at the suggestion of F. T. Hatcher, who had become an interested party. It is not recited for whom Johnson was acting as trustee; and, when asked about it, upon cross-examination, he testified as follows:

"Q. Who are you trustee for, Mr. Johnson? A. I don't know whether I could answer that question accurately or not. I am dealing for Mr. F. T. Hatcher, and he can give you the details about the arrangement. On the suggestion of Mr. Hatcher, who is my law partner, I became trustee in this case, and he can give you the details of it."

It appears from the testimony of F. T. Hatcher that on February 24th he had attempted to deal with Bowling and his trustees, Taylor, Ford and Ratliff, for the purchase of the Bowling lands at $50.00 per acre, and that the deed therefor should be taken in the name of Johnson, trustee, to be held by him in trust for Hatcher, Ford and Taylor, all of whom were to share equally in any profits that might be derived from the property by sale, lease or otherwise. This fully appears from Hatcher's testimony as follows:

"Q. Who is J. R. Johnson trustee for? A. At that time he was trustee for myself, Mr. J. W. Ford and W.

B. Taylor. Q. What was the object of his being trustee?
A. To hold the property until we advised him to convey
it. Q. What else was he to do? A. I don't know. Q.
In other words, he was to hold the property as trustee
for yourself, W. B. Taylor and J. W. Ford and at the
same time W. B. Taylor, J. E. Ratliff and J. W. Ford
was holding this property for J. M. Bowling? A. I don't
understand it that way. . . . Q. At that time what
part of the proceeds was Judge Ford to get? A. To
have title to a one-third of the lands at the price agreed
on at $50.00 per acre on the day of the verbal agreement.
Q. He was to have a one-third interest? A. Yes, sir.
Q. Taylor a third? A. Yes, sir. Q. And you a third?
A. Yes, sir. Q. What was Johnson, the trustee, to get?
A. One-half of my profit. Q. What was you going to do
with it? A. Sell it."

It is not explained why the trustees attempted to sell
this land to Johnson for $50.00 per acre, after they had
procured Morgan to cancel his contract for $60.00 per
acre.

Under the sale by Bowling to Rogers and Day, Rogers
paid Bowling $15,696.80 on March 17th, with which Bowl-
ing paid his debts, including the purchase money for the
land, which was evidenced by the note in the First
National Bank of Pikeville. Before the trustees made
the sale to Johnson on March 19th, Bowling had succeed-
ed in paying all of his debts with the exception of one or
two trifling ones, which had not been scheduled in bank-
ruptcy, and about which there was a controversy. It fur-
ther appears, beyond a doubt, that at the time Johnson
made his contract with Ford, Taylor and Ratliff, trustees,
that he, Hatcher, Ford, Taylor and Ratliff all knew of the
sale to Rogers and Day, and that Bowling had paid off
his indebtedness, including the note which Ford, Taylor
and Ratliff had executed at the First National Bank of
Pikeville for the $10,000.00 purchase money.

But, as the trustees were not only claiming the right
to sell the property but had already made a contract to
sell it to Johnson, Bowling filed this suit on March 19th,
1917, in the Pike circuit court alleging that he was the
owner of the mineral property in controversy; that the
defendants, Ford, Taylor and Ratliff, held the same in
trust for him pursuant to the agreement entered into in
the United States district court; that he had sold the

property to Rogers and Day; that they had furnished him the money to pay his indebtedness, which had been paid; that his trustees were attempting to sell the property to F. T. Hatcher for the sum of $50.00 per acre.; and that Hatcher, Ford and Taylor were in collusion in attempting to purchase the property and to realize for themselves a portion of the profits therefrom in violation of Bowling's rights, and their duties as trustees. He asked an injunction to prevent them from making the sale to Johnson, and that the trustees be compelled to carry out his contract with Rogers and Day by executing a deed to them pursuant to plaintiff's contract with them. By an amended petition, filed the same day Rogers and Day were joined as plaintiffs, and Johnson, trustee, was made a defendant. Day subsequently assigned his interest to Rogers, who is now the sole claimant under the sale from Bowling.

By their joint answer Ford, Taylor and Ratliff deny the principal allegations of the petition, and allege that they were acting as trustees pursuant to an appointment in the bankruptcy proceedings in the United States district court for the eastern district of Kentucky, and for that reason they put in issue the jurisdiction of the Pike circuit court either of themselves, or of the subject-matter of this litigation. At the same time Johnson, as trustee, filed his answer merely alleging that he was then, and had been at all times, ready, able and willing to comply with the terms of the contract by which Taylor, Ford and Ratliff undertook to sell the property to him. Johnson's answer contained nothing else; he did not make it a counterclaim or ask any affirmative relief whatever. Neither did he then, nor at any time, make a tender of the purchase money called for by his contract.

When the case came on for hearing upon the motion for a temporary injunction, counsel for Ford, Ratliff and Taylor, trustees, who also represented Johnson, trustee, pressed their objection to the jurisdiction of the Pike circuit court, whereupon Judge Butler, the presiding judge of that court, stated from the bench, that in his opinion, the United States district court had dismissed Bowling's bankruptcy proceeding in that court, and consequently, that the contention that the Pike circuit court had no jurisdiction, was without merit.

Judge Butler suggested, however, that counsel for appellant and the trustees might communicate with Judge Cochran, of the federal court, and ask him whether he regarded his court as still having jurisdiction of the Bowling bankruptcy proceedings; or, that they take the necessary steps to enjoin Judge Butler if he was without jurisdiction to proceed in the matter. And, in order that counsel might have time to take one of these courses, Judge Butler postponed the hearing of the motion for ten days.

It seems, however, that counsel for defendants did not act upon the suggestion of Judge Butler. And, evidently for the purpose of avoiding an unseemly clash of judicial authority, Judge Butler wrote to Judge Cochran asking if he still claimed jurisdiction of Bowling's bankruptcy proceedings, and Judge Cochran not only replied that he did not, but he further stated that he knew of no reason why Bowling should not pay his debts, if he desired to do so. After these motions had been passed upon, and the case was ready for submission upon the motion, appellant filed an affidavit, on June 18th, 1917, asking Judge Butler to vacate the bench, which he declined to do.

The case was elaborately prepared, and upon final hearing the court adjudged that Rogers was entitled to a deed to the property in controversy, giving the trustees and Bowling thirty days to execute it; and, it directed, that in case of their failure to do so, the commissioner should make the conveyance for them. The claim of Ford, Ratliff and Taylor to the right to sell the land was dismissed, and they were enjoined and restrained from selling it, or executing a conveyance thereof to any other person. And, although the judgment recites that the relief sought by J. R. Johnson, trustee, for specific performance was denied, it nowhere appears in the pleadings that Johnson ever sought any relief, except the dismissal of plaintiff's petition. Ford, Taylor and Ratliff are not appealing; they are, however, named as appellees in the statement of appeal. Johnson, trustee, is the only appellant.

The grounds urged by Johnson for a reversal may be classified under three heads; (1) That Judge Butler erred in declining to vacate the bench; (2) that the title to the land in controversy was in Taylor, Ratliff and

Ford, trustees, and that they, alone, had the power to sell or convey it; and (3) that the sale was within the statute of frauds and not enforcible.

1. In his affidavit asking Judge Butler to vacate the bench, appellant states:

"That the record discloses that the said Judge Butler was, previous to the institution of this case, interested in the sale of the land in controversy herein; that it is testified by J. M. Bowling, one of the plaintiffs in this action, that the said Judge John F. Butler asked him, the said J. M. Bowling, to give him a contract on this land and that if he would give him a contract that he could sell the same within twenty days.

"It is further testified in this record that J. M. Bowling, one of the plaintiffs herein, said that Judge John Butler called him, the plaintiff, J. M. Bowling, back into one of the jury rooms and told him that he wanted to purchase this land; and the said J. M. Bowling further stated, 'I think he (meaning John F. Butler) wants to buy it for Fon Rogers,' one of the plaintiffs in this action."

F. T. Hatcher testified that in a conversation with Bowling in the latter's office on February 24th, Bowling said that Judge Butler had called him back one day into one of the jury rooms, and told him that he wanted to purchase the land, and that Bowling said to Hatcher, "I think he wants to buy it for Fon Rogers." Hatcher further testified that Judge Ford was present on that occasion.

Turning to the testimony of Bowling, on which the affidavit was, in part, based, we find it reads as follows:

"Q. I will ask you if you didn't, in your office, tell Tom Hatcher, on the 24th day of February, 1917, and in the presence of Judge Ford, that you had discussed this matter with Judge Butler, judge of the Pike circuit court, and that Judge Butler had advised you to sell to Rogers and Day and that the trade would be all right? A. I never had no such conversation and there is not one word of truth in that, and I don't believe either one of them will swear to it. It is not so and that question is asked for the purpose of trying to keep Judge Butler from trying this case, and it is not right. Q. I will ask you, Mr. Bowling, if you didn't further say, in the same conversation, in your office, on the 24th of February, 1917,

that Judge Butler called you back into the jury room at the court house and advised you to sell this land to Rogers, and didn't you further say to Tom Hatcher, in the presence of Judge Ford, that it was your opinion that Judge Butler was a party in buying the land or was getting an interest in it? A. I did not. Q. Anything like that? A. I will tell you what Judge Butler did say to me. It now comes to my mind. He told me one day if I would give him a contract on the land—Rogers' nor Day's name was never mentioned—I believe he said in twenty days, he could sell it for me. He told me that one day and we were discussing that, but this matter nor this deal nor Mr. Rogers' nor Mr. Day's names were never mentioned, nor I never mentioned their names to Mr. Hatcher nor Mr. Ford. Q. Did you tell Mr. Hatcher and Judge Ford that? A. He told me if I would give him a contract on it he could sell it within twenty days, to the best of my knowledge. Q. Did you tell that to Hatcher and Ford? A. I might have told them that; I might have told them that.''

Upon this subject Judge Ford testified as follows:

''Q. Were you present in Mr. Bowling's office at the time spoken of by Mr. Hatcher wherein it was discussed by Mr. Bowling with reference to John F. Butler seeking to buy this land of Mr. Bowling? A. I heard something said, but I don't remember it just as it was stated. Q. You did hear a statement made there at the time along this line? A. Yes, sir.''

The substance of this is that Judge Butler told Bowling that he believed he could sell the land in question under an option of twenty days, but did not say to whom he thought he could sell it. It is not contended that any option was ever given to Judge Butler, or that he ever attempted to sell the land to any one. We have stated the testimony upon the subject somewhat at length, because we feel this is really the most important question presented upon this appeal. The gravamen of the affidavit is that Judge Butler was interested in the sale of the land in controversy.

There is, however, no proof that Judge Butler ever was in any way interested in the sale of the land; at most he only suggested to Bowling that he might help him in making a sale; but his suggestion was never acted upon, and his services were not accepted. He had no

fee or compensation of any kind dependent upon the decision, and could in no way profit by it. From this proof we fail to see how Judge Butler was interested in the sale of this land in a sense that would disqualify him.

There is this further reason why the motion for Judge Butler to vacate the bench was properly overruled; the motion was not timely made. It has repeatedly been held by this court that a party cannot withhold his objection that would disqualify the presiding judge and use it only after he has "drawn the fire" of the judge in the shape of an unsuccessful ruling. The application, to be available, must be made before the appearance to the merits of the action, or the submission of preliminary motions preparatory to a trial, unless the affidavit is based on facts discovered after the issue was made. Ky. Stats., sec. 968; Vance v. Field, 89 Ky. 178; Hargis v. Commonwealth, 135 Ky. 578; Adams v. Gardner, Judge, 176 Ky. 258. This motion was made on June 18th, 1917, nearly three months after the defendants had answered, and Judge Butler had ruled that he would take jurisdiction of the case. Furthermore, according to the testimony of Hatcher and Ford, the conversation with Bowling in which they learned these facts was held on February 24th, about four months before the affidavit was filed. On March 24th, 1917, defendants had demurred to the jurisdiction of the court; and on May 15th, 1917, they had taken the depositions of Johnson, Hatcher and Ford. An amended petition charging fraud against the defendants had been filed on May 21st, and on May 23rd Taylor had withdrawn from the case. But it was not until June 18th, about three months after the court had passed upon the question of jurisdiction adversely to the defendants that they concluded they would raise the question of Judge Butler's alleged disqualification. It came too late.

2. Coming to the merits, the appellant rests his case upon the proposition that Taylor, Ratliff and Ford, being trustees, had the legal title to the land in question, and they only could convey it. But this view entirely overlooks the character of the duty imposed upon these trustees. They held this property for the specific purpose of procuring the payment of Bowling's debts. After those debts were paid, the interest of the trustees ceased, and it was their duty to re-convey to Bowling any of his

land to which they still held title, or to turn over to him any proceeds of such land.

Notwithstanding the fact, however, that their duties and interest as trustees had ended, the trustees entirely overlooked that salutary rule of law which forbids a trustee, or any other person who occupies a fiduciary or quasi-fiduciary position, from gaining any personal advantage touching the thing or subject as to which the fiduciary position exists. It is made plain from the proof in this case that these trustees did not have this salutary rule in view; on the contrary, they were scheming and holding out to make a personal gain. There is no other explanation of their insisting upon the cancellation of the Morgan contract by which the land could have been sold for $60.00 an acre, or $2,150.00 more than was finally realized. This is not an action, however, to recover that loss from these trustees, and we do not pass upon the question of their liability.

Furthermore it appears from the defendants' proof that under the alleged preliminary verbal contract of February 24th the trustees agreed to sell the land to Hatcher and his associates at $50.00 per acre, and the price was raised to $55.00 an acre only after they had learned of Rogers' purchase, at that price. The procuring of the untruthful notary's certificate of acknowledgment was a step in the scheme. The testimony of Taylor, Ford and Hatcher plainly shows it was the purpose of at least Taylor and Ford to acquire the property for themselves and thus make a profit at Bowling's expense. Their position was well stated by trustee Ford when he admitted that "the land was pretty valuable and he wanted to hold on." To refuse Bowling relief under such circumstances would be a perversion of the law. We take it to be a sound legal proposition that where a trustee holds land for the payment of a debt, and the debt has been satisfied, a court of equity will require him to convey the land to the owner; and if the owner can require a re-conveyance to himself, he may require a conveyance to his vendee. We are of the opinion that the judgment of the circuit court gave Bowling no more than that to which he was entitled.

3. The contention that the case comes within the statute of frauds because there was no written contract between the trustees and Rogers and Day, is based upon

a misconception of the legal principles which control this case, since the action was not based upon any contract between the trustees and Rogers, but upon the trust relation that existed between the trustees and Bowling. When it has been determined that Bowling has the right to require these trustees to release his property, they have no further interest in the case, and it is immaterial to them as to whom Bowling may direct its conveyance. In our opinion the statute of frauds has no application.

Judgment affirmed.